## CARGILL v. DUFFY.

(Circuit Court, S. D. New York. June 19, 1903.)

1. MASTER AND SERVANT—LIABILITY OF OWNER OF LICENSED CAB FOR NEGLIGENCE OF DRIVER—DEFENSE OF BAILMENT.

Under the ordinances of the city of New York regulating the use of cabs and hacks, which require licenses for both cabs and drivers, and that the cabs shall be numbered and have the name and place of business of the owner and licensee posted therein, and provide that every owner or driver of any hackney cab shall wear conspicuously a metal badge having engraved thereon the words "Licensed Hack" and the number of such licensed hackney cab, "said badge to be issued to and belong to said owner and to be issued by him to any driver representing him and for whom he shall be responsible," the relation between the owner of a licensed cab, having a corresponding driver's badge, and a driver whom he puts in charge of such cab and to whom he furnishes the badge, is that of master and servant, so far as relates to passengers or the public, whatever may be their relation as between themselves; and the owner of a licensed cab who lets the same, with a horse and harness, by the day, for a fixed price, to the driver, to whom he also furnishes his badge, cannot avoid liability to a person injured in the street through the negligence of the driver, on the ground that he was merely a bailor.

2. MUNICIPAL CORPORATIONS—POWERS OF LEGISLATION—VALIDITY OF ORDINANCE.

The provisions of the state statute conferring upon the city of New York the power to establish ordinances "not inconsistent with the laws of the state," by such exception merely inhibit legislation inconsistent with the statutory law applicable to the city, and do not preclude the city from enacting an ordinance, in the exercise of its police powers, because it may change a common-law rule of personal liability prevailing in the state.

At Law. On motion by defendant to set aside the verdict of a jury and enter a nonsuit.

S. Whitney Dunscomb, Jr., for plaintiff.

Michael J. Joyce, for defendant.

RAY, District Judge. On the morning of September 4, 1900, as the plaintiff, a resident and inhabitant of the state of Texas, was lawfully and with due care walking across Forty-Third street, in the city of New York, from the southerly to the northerly side, and moving in a northeasterly direction at a point east of Broadway, and a short distance therefrom, he was carelessly, negligently, and recklessly driven upon and knocked down by the driver of a hackney cab, drawn by a horse, both owned by the defendant. The plaintiff sustained serious injuries, and was free from fault or negligence. The negligence of the driver of this cab, James Plunkett, was proved beyond question, and the verdict of the jury was reasonable in amount.

The defendant insists that he is not responsible for the negligence of the driver; that while he was the owner of the horse, harness, and cab, for which he had taken and held a license as hereinafter stated, he had let the same for the day to the driver, who was licensed to drive cabs for hire, for a good consideration paid in advance, and that the relation of bailor and bailee, and not that of master and

servant or of principal and agent, existed between them, and therefore he (defendant) was not responsible for the negligent acts of the driver while using the horse and cab.

The proof shows: (1) That defendant owned several horses, harnesses, and cabs kept and used for the purpose of carrying passengers for hire in and upon the streets of the city of New York, of which this horse and cab in question were one. (2) That the defendant had taken from the city authorities a license for each of these cabs, authorizing him to use same for such purpose. (3) That in each cab, duly numbered as required by the municipal laws, he had the number of the cab, with the printed rules and regulations relating to the use of cabs, as required by such laws, with the name of the owner of the cab, duly posted up. This was for the information of the passengers and public. (4) That, with each license for each cab, he received from the city authorities a driver's badge, with a number thereon corresponding to the number of the cab, with the words "Licensed Hack" also thereon. (5) The owner of the cab, the defendant, kept these badges in his own possession except when in actual use, and when he let a cab, with horse and harness, to a driver, he handed the proper corresponding badge to such driver, who wore same while using the cab for the purposes aforesaid, but returned it at night with the cab. (6) It was the custom of the defendant to let by the day, to certain drivers, cabs, with horse and harness almost always, for a certain sum per day, which they usually paid in advance, and with the mutual understanding that such cab was to be used for the purpose for which licensed, and no other. (7) For some weeks at least the defendant had let this cab, or others, duly licensed and numbered, to this driver, with horse, harness, etc., and each morning as the driver went out he received from the defendant the corresponding badge, that is, the driver's badge that went with the cab, and without which he had no right to drive or use it for the purposes mentioned. This driver usually paid $2.50 in advance, and always returned the badge, with the horse, harness, and cab, at the end of the day's work. (8) On the morning in question the defendant, on these terms, delivered to this driver in question licensed cab No. 501, with horse and harness, and badge No. 501, and received the sum of $2.50. (9) It was while driving this horse and harness and cab for the purposes aforesaid—the carriage of passengers for hire—that this driver ran upon and injured the plaintiff. (10) This driver had no right to use this horse, harness, and cab, or either, for any other purpose, and this was mutually understood. (11) There was nothing to inform the passenger or passengers or public of this bargain of hiring between the owner and the driver. Their information was derived from the notice above mentioned duly posted in the cab with name of owner, number, the corresponding number on the badge of the driver, and the statement, so printed, that this owner had a license from the proper authorities to run and operate this cab. There was nothing to indicate the name of the driver, or that he was operating or running the cab on his own account, or had a legal right to so operate or run it. This the defendant knew. In fact, the horse, harness, and cab belonged to the

defendant, were advertised to the world as defendant's, and as being run on his account as his own. Is he responsible to third persons for the acts of the driver while carrying on this business? Can he escape liability because of this private and concealed bargain made from day to day and for the day only?

The municipal laws and regulations of the city of New York provide as follows:

Section 11, Ordinances and Laws Regulating Certain Licenses in the City of New York, 1899, says: "The term 'hackman' shall be deemed to include owner or driver, or both."

By section 3, Id., for any violation of the regulations provided by the ordinance, whether by owner or driver, the license of the owner may be suspended.

Section 448 (Rev. Ord. 1897, c. 7, art. 7) provides that any person having charge of any hackney cab shall, upon being requested to do so, give to any person the number of his cab, the name of the owner, his place of abode, and stable.

Section 441, Id., provides that "every licensed owner or driver of any hackney * * * shall wear conspicuously on the left breast of the outer coat a metal badge * * * having engraved thereon the words 'Licensed Hack' and the number of such licensed hackney cab, said badge to be issued to and belong to said owner, and to be issued by him to any driver representing him, and for whom he shall be responsible."

Section 444, Id., provides that there shall be fixed in each hackney cab, in such manner as can be conveniently read by any person riding in the same, a card containing the name of the owner of said cab, and the number of his license.

Section 55, Ordinances and Laws Regulating Certain Licenses in the City of New York, 1899, says: "Every person driving a licensed hack or express, other than the person named in the license therefor, shall be licensed as such driver." Ord. May 22, 1899, § 59; Rev. Ord. 1897, c. 7, art. 7, § 441.

A license is issued to a hackman for personal qualifications, after an examination, and may not be assigned to another. Ord. May 22, 1899, § 59; Rev. Ord. 1897, c. 7, art. 7, § 441; Ord. May 22, 1899, § 55; Rev. Ord. 1897, c. 7, art. 7, §§ 421–426, 428–430, 432, 433.

(a) Every license shall state the number for which it is granted. Rev. Ord. 1897, c. 7, art. 7, § 426.

(b) Each license shall be numbered and registered in the mayor's marshal's office, together with the name and residence of the person so licensed, and any change of residence must be reported at said office within three days thereafter, under penalty of suspension of such license. Rev. Ord. 1897, c. 7, art. 7, § 432.

(c) All licenses issued by the bureau of licenses shall be according to an established form, printed with corresponding stub and regularly numbered, with suitable blank spaces for writing in the name and residence of the licensee, kind and class of license, location and privileges allowed, and amount of fee paid, all properly bound in book form. All such licenses shall be duly classified and recorded in suitable registers, and fully indexed. Ordinance to Provide for the

Issuing of Licenses in the City of New York, Approved Feb. 8, 1898, § 3.

(d) All licenses issued by the bureau of licenses shall be granted by the mayor, and duly issued upon regular application to the bureau of licenses. The registers of licenses shall be public records, and extracts may be certified by the chief of the bureau, or the deputy or assistant in charge of a branch office, for use as evidence. Id. § 4.

(e) There shall be kept in the principal office of said bureau, and each and every branch office thereof, a book recording consecutively each license as issued, showing its kind and class, whether new or renewed, name of licensee, regular number of blank form, and amount of fee received day by day. Id. § 5.

Every licensed hack, except such as are specially licensed, shall be provided with a suitable lamp on each side, and shall have securely fastened across the middle of the outside of each lamp a metal band not less than two inches in width, out of which the official number of the license shall be cut after the manner of a stencil plate, the component figures of such numbers to be not less than $1\frac{1}{2}$ inches in height, and the style of the whole to be approved by the mayor or chief of the bureau of licenses. Every licensed hack shall have the official number of the license legibly engraved or embossed upon a metal plate and affixed inside, as designated and approved by the mayor or chief of the bureau of licenses, and no licensed hack shall carry or have affixed to it, inside or outside, any number except the official number as aforesaid. General Ordinance in Relation to Business Requiring a License, and the Regulation Thereof in the City of New York, Approved May 22, 1899, § 15. See, also, Rev. Ord. 1897, c. 7, art. 7, § 442.

All words, letters, and numbers hereinbefore prescribed for licensed vehicles shall be shown permanently and conspicuously on each outside thereof in colors contrasting strongly with background, and not less than two inches high, as directed and approved by the mayor or chief of the bureau of licenses, and shall be kept legible and plainly visible at all times during the term of the license, and shall be obliterated or erased upon change of ownership or expiration of the license; and no person shall have or use any vehicle with words, letters, or numbers thereon like those herein prescribed for licensed vehicles, without being duly licensed therefor. Id. § 59.

Every licensee shall have the official license, and exhibit the same upon the demand of any person, and shall report within three days to the bureau of licenses any change of residence or place of business, and shall at all times perform the public duties of the business licensed, when called upon to do so, if not actually unable. Id. § 58.

Every licensed hackman, whenever with a hack or waiting for employment anywhere in the city of New York, shall wear conspicuously on the left breast of the outer coat a metal badge, of a shape, size, and style approved by the mayor or chief of the bureau of licenses, and furnished by said bureau, having engraved or embossed thereon the official designation and number of the license, together with the words "New York City." Id. § 60. Said badge to belong

to said owner, and to be issued by him to any driver representing him, and for whom he shall be responsible.

There shall be fixed in each hackney coach or cab, in such manner as can be conveniently read by any person riding in the same, a card containing the name of the owner of said owner of said carriage, the number of his license, and the legal rates, as specified in section 434, printed in plain, legible characters, under a penalty of arrest, said card to be provided by the license bureau, and to be furnished free to the owner of such hackney coach or cab; and such card shall be fastened to the back of each cab or coach on the inside thereof, at least two feet above the seat, or it shall be hung to or from a suitable fastening fixed in the back of each cab or coach, so that each card will hang at least two feet above the seat and be plainly visible. Rev. Ord. 1897, c. 7, art. 7, § 444.

Every owner or driver, or person having charge of any hackney coach or cab, shall, upon being requested to do so, give to any person or persons the number of his coach or cab, the names of the owner and driver thereof, and their place of abode and stable. Id. § 448.

Every licensed owner or driver of any hackney coach, carriage, or cab in the city of New York, whenever he shall be with such coach, carriage, or cab on any public stand, or at any steamboat landing or railroad depot or line, ball or place of amusement, or while waiting for employment at any place in said city, shall wear conspicuously outside on the left breast of the outer coat a metal badge of shape and size approved by the mayor, and having embossed or engraved thereon the words "Licensed Hack," and the number of such licensed hackney coach, carriage, or cab, said badge to be issued and belong to said owner, and to be issued by him to any driver representing him, and for whom he shall be responsible. Rev. Ord. 1897, c. 7, art. 7, § 441.

Every person driving a licensed hack or express, other than the person named in the license therefor, shall be licensed as such driver, and every application for such a license shall be indorsed, in writing, by two reputable residents of the city of New York, certifying to the competence of the applicant. Ordinance Approved May 22, 1899, § 55.

The foregoing and the following subdivisions under this paragraph show that a hackman is licensed to keep and drive a particular cab, which must bear upon it a number corresponding to the number of said hackman's license, and licensed hackmen may not exchange their cabs with nor lease them to other licensed hackmen. If an owner or proprietor permits another to drive his cab, the latter must be a licensed driver who represents the owner or proprietor, and for whom the owner or proprietor is responsible.

The mayor of the city of New York shall, from time to time, issue licenses under his hand and seal to so many and such persons as he shall think proper, to keep hackney coaches, carriages and cabs, for hire in said city, and may revoke any or all of said licenses for cause. Rev. Ord. 1897, c. 7, art. 7, § 421.

No person who is not a citizen of the United States, or who has not declared his intentions to become a citizen of the United States, a resident of this city for six months previous to his application for a license, and the owner of two good horses for such hackney coach, or one for such cab, with a good and sufficient coach or cab, shall be licensed as aforesaid. Said license shall be revoked by the mayor upon such person ceasing to be a resident of this city. Id. § 442.

The mayor of said city shall administer to any person applying for such license an oath or affirmation in relation to the matters embraced in section 422 of this article, and may examine such applicants relative to all necessary qualifications to receive such license. Id. § 423.

All licenses granted to owners of hackney coaches, carriages, and cabs shall expire on the first Monday in June next after the date thereof. Id. § 424.

No person shall be entitled to have his license renewed unless he shall make it satisfactorily appear that he is still eligible under this article. Id. § 425.

Every license shall state the number for which it is granted. Id. § 426.

Every person who shall keep or drive any hackney coach or cab for hire in the city of New York, without being licensed as aforesaid, shall be liable to a fine of five dollars for every such offense. Id. § 428.

The mayor of the city of New York shall have full power and authority to license persons of mature age, citizens of the United States and residents of the state of New York, and capable young men between the ages of 18 and 21 years, when it is satisfactorily shown to him that such applicant is the sole or chief support of aged or indigent parents or other relations, or the son of the owner whose coach he applies for permit to drive, to drive hackney coaches or cabs in said city, such license to remain in force one year from the date thereof, unless sooner revoked or meanwhile suspended by the mayor, in his discretion. Id. § 429.

Each and every applicant for such license shall produce satisfactory evidence of good character, and shall file in the mayor's marshal's office a certificate in writing, subscribed by at least two reputable citizens, and certifying that applicant has been personally well and favorably known to subscribers for at least one year previous. Id. § 430.

Each license shall be numbered and registered in the mayor's marshal's office, together with the name and residence of the person so licensed, and any change of residence must be reported at said office within three days thereafter, under penalty of suspension of such license. Id. § 432.

Each hack driver so licensed may drive any duly licensed hackney coach, cab, or carriage during the term of his license. Id. § 433.

The defendant testified that he was conversant with all these laws and ordinances.

As between the defendant and the driver, it may well be said, perhaps, that the relation was that of bailor and bailee. But as to the

passengers and the public traveling upon or using the public streets of the city who had no knowledge of this secret bargain, a different rule should apply, and this court thinks does apply. The owner of the cab had taken out a license authorizing him to drive or use it, or cause it to be used, as his own, upon the streets of the city for a public purpose, to wit, the carriage or transportation of passengers, with their luggage. It was numbered, and the licensor, the city, issued a driver's badge to be worn by the driver of that particular cab, bearing a corresponding number, so as to enable the public to identify the number of the cab and its owner, even if ignorant of the owner's name posted thereon or therein. This municipal ordinance or law had a purpose—the protection of the public. By these ordinances any person having charge of a hackney cab, on request, is to give to any person the number of the cab, the name of its owner and his place of abode, and the location of the stable. Why this provision? Then again, every licensed owner or driver of any hackney cab, etc., "* * * shall wear conspicuously on the left breast of the outer coat a metal badge * * * having engraved thereon the words 'Licensed Hack' and the number of such licensed hackney cab, said badge to belong to such owner, and to be issued by him [the owner], to any driver representing him [the owner], and for, whom [the driver] he [the owner] shall be responsible."

It seems clear that, under this ordinance, when the defendant placed this licensed cab in the custody and control of this driver, for him to use during the day for the purpose for which licensed, and placed on such driver the badge issued by the city that went with it, and which he contracted with the municipal authorities should be issued only to a driver representing the owner, he made such driver his representative, agent, or servant, and so held him out to the world, and is estopped as to this plaintiff from asserting the contrary or setting up the secret contract; and it also seems clear that he must be responsible for the negligence of such agent or servant in running the cab, irrespective of the declaration of the ordinance that he shall be responsible for such driver, that is, the acts of such driver. The defendant complied with the law, accepted its terms and benefits, having full knowledge of the law, and sent out this horse, harness, and licensed cab in charge of this driver, upon whom he placed notice to the world that such driver represented him, and that he (the owner of the cab) was responsible for the acts of such representative. In the cab itself the defendant had fixed the notice giving his name as owner, and the number of his license, corresponding to the number on the badge which he had placed on the breast of the driver.

In England, the municipal ordinances of the city of London (Metropolitan Hackney Carriages Act) are substantially the same as those of the city of New York above quoted, and the English courts hold that, notwithstanding such a bargain or contract between the owner and the driver as was made in this case, the relation between them, as to the public, is that of master and servant, and not that of bailor and bailee, and that the owner is responsible to persons on the street injured by the negligence of the driver of the hack, also for property so injured, and for property of the passenger lost by such negligence.

Morley v. Dunscombe, 11 L. T. (O. S.) 199; King v. London Improved Cab Co. Lim., 23 Q. B. D. 281; Powles v. Hider, 6 E. & B. 207; Fowler v. Lock, L. R. 7 C. P. 272; Venables v. Smith, 2 Q. B. D. 279; Keen v. Henry, 1 Q. B. 292 (Nov. 1893). King v. London Improved Cab Co. Lim., 23 Q. B. D. 281, was decided in the Court of Appeal in June, 1889, and approves Venables v. Smith, 2 Q. B. Div. 279. The facts in those cases, as in Morley v. Dunscombe, supra, are on all fours with the facts of the case now under consideration.

The provisions of the Metropolitan Hackney Carriage Act, so far as applicable or material, are as follows:

"And be it enacted, that any two of the commissioners of stamps, or any person duly authorized by the said commissioners, shall grant licenses under their or his hands or hand, upon the terms and conditions and in the manner hereinafter mentioned, to keep, use, employ and let to hire any hackney carriage at any place within the distance of five miles from the General Post Office in the city of London; and the said commissioners, or the person so authorized to grant such licenses as aforesaid, shall at the time of granting every such license, and at all other times when necessary, deliver to the persons applying for such license respectively a numbered plate, to be fixed upon every such hackney carriage in the manner hereinafter mentioned, upon which said plate shall be painted a number corresponding with the number which shall be inserted in such license, together with such device as the said commissioners shall see fit to cause to be painted on every such plate; and such plate shall be known and distinguished from other plates required by this act to be fixed upon hackney carriages by the name of the 'Stamp Office Plate.'" St. 1 & 2 Wm. IV, c. 22, § 7.

"And be it enacted, that there shall be specified in every such license to be granted as aforesaid the true Christian name and surname and place of abode of the person and of every person who shall be a proprietor or part proprietor of the hackney carriage in respect of which such license shall be granted, or who shall be concerned either solely or in partnership with any other person in the keeping, using, employing, or letting to hire of such hackney carriage, the number of which shall be painted or marked on the plates to be fixed on such hackney carriage, together with such clauses and conditions for more effectually securing the payment of the weekly duty by this act made payable in respect of every such license as the commissioners of stamps shall think fit, and every such license shall bear date on the day on which the same shall be granted." Id. § 12.

"And be it enacted, that the particulars of every license which shall be granted under any of the provisions of this act and of all alterations made therein, and of all indorsements thereupon, shall be entered, in such manner and form as the commissioners of stamps shall direct, in one or more book or books to be provided and kept for that purpose at the said head office for stamps; and in all courts, and before any justice of the peace, and upon all occasions whatsoever, the entries made or contained in any such book or books shall be received as evidence and be deemed to be sufficient proof of all matters and things therein registered or contained relating to any such license as aforesaid, without requiring the production of the original license, or of any requisition, notice, or other document upon which any such entries may be founded, and without any further proof than the production of such book or books; and any person shall be at liberty to inspect any such book or books without payment of any fee or reward." Id. § 32.

"And be it enacted, that the particulars of every license which shall be granted as aforesaid shall be entered in books to be kept for that purpose at the office of the said register; and in all courts, and before any justice of the peace, and upon all occasions whatsoever, a copy of any entry made in any such book, and certified by the person having the charge thereof to be a true copy, shall be received as evidence, and be deemed sufficient proof of all things therein registered, without requiring the production of the said

book, or of any license or of any requisition or other document upon which any such entry may be founded, and every person applying at all reasonable times shall be furnished with a certified copy of the particulars respecting any licensed person without payment of any fee." 6 & 7 Vict. c. 86, § 16.

"And be it enacted, that it shall not be lawful for any person to keep, use, employ, or let to hire any hackney carriage, at any place within the distance of five miles from the General Post Office in the city of London, unless such person shall have a license in force so to do under the hands of two of the commissioners of stamps, or under the hand of some person duly authorized by the said commissioners to grant such license, nor unless there shall be fixed on such hackney carriage, in the manner hereinafter mentioned, the numbered plate hereinafter directed to be delivered with every such license." St. 1 & 2 Wm. IV, c. 22, § 6. See, also, paragraph 1, subd. "f," 1 & 2 Wm. IV, c. 22, § 7.

"And be it enacted, that upon every hackney carriage which shall be used for the purpose of standing or plying for hire, or which shall be let for hire, within the distance of five miles from the General Post Office in the city of London, the stamp office plate shall be fixed in a conspicuous place on the outside of such hackney carriage in the manner hereinafter directed three other numbered plates of the description hereinafter mentioned, to be provided for this purpose by the proprietor of such hackney carriage; that is to say, a plate, having thereon the number of the stamp office plate placed upon such hackney carriage, denoted by projecting figures of one inch and a half at least in length, and of a proportionate breadth, and without any other figure or any letter or other device thereon, shall be fixed in a conspicuous place on the inside of the back of such hackney carriage; and two other plates upon which there shall be painted, in letters and figures of black upon a white ground, the Christian name and surname of the proprietor or one of the proprietors of such hackney carriage, and the number of the said stamp office plate, shall respectively be fixed in some conspicuous place on each side of such hackney carriage; and if it shall happen the commissioners of stamps or their authorized officer shall be dissatisfied with the position of any plate fixed or placed upon any such hackney carriage, and shall direct such plate to be placed upon some other conspicuous part of any such hackney carriage, such plate shall be placed and fixed accordingly upon any part of such hackney carriage in compliance with such direction; and every such plate shall be placed and fixed upon every such hackney carriage in such manner that the number thereon shall be at all times plainly and distinctly visible and legible, and if any proprietor or driver of any hackney carriage shall permit or suffer any such plate, or the number on any such plate, placed or fixed upon such hackney carriage, to be in any manner or by any means concealed from public view, or to be inverted, or if such proprietor or driver, or any waterman or assistant to the driver of hackney carriages shall molest or oppose or by any means endeavor to prevent any person in or from inspecting any such plate fixed or placed upon any such hackney carriage, or in or from taking or noting the number thereof, or if any such proprietor, driver, or waterman or assistant shall by word of mouth give or declare to any person a wrong number as or for the number of such plate or of such hackney carriage, such proprietor, driver, or waterman or assistant shall forfeit five pounds." Id. § 20.

"And be it enacted, that in any complaint or other proceeding for the recovery of any penalty incurred under this act in respect of or in relation to any hackney carriage, if evidence shall be given that the carriage in respect of which or in any manner relating to which any such proceeding shall be commenced or prosecuted was seen in or upon any public street or road having thereon any numbered plate by this act directed to be fixed upon a hackney carriage, or having thereon any plate resembling or intended to resemble any such plate as aforesaid, such carriage shall be deemed and taken to be a hackney carriage, and such evidence as aforesaid shall be received as sufficient proof that such carriage was kept, used and employed and let to hire as a hackney carriage within the meaning of this act; and that in all such proceedings as aforesaid, the name as described in the license granted with or relating to the number of the stamp office plate, if any, fixed

or placed upon any such carriage, whether such license shall be in force or not, shall for the purpose of this act be deemed to be the proprietor of such carriage unless the contrary be proved." Id. § 24.

"And be it enacted, that hackney carriages standing in any street and having numbered plates are deemed to be plying for hire.

"And be it enacted, that if any carriage shall be used for the purpose of standing or plying for hire as a hackney carriage, in any public street or road at any place within the distance of five miles from the General Post Office in the city of London, such carriage not having the proper stamp office plate fixed thereon as required by this act, the driver of such carriage or the person plying for hire therewith, or having the care thereof, not being the owner or proprietor thereof, shall forfeit five pounds, and if he shall be the owner or proprietor of such carriage he shall forfeit ten pounds." Id. § 23.

"And be it enacted, that it shall not be lawful for any person to act as driver of any hackney carriage * * * whether such person shall or shall not be the proprietor of such carriage * * * within the limits of this act, unless in each case such person shall have a license so to do, and a numbered ticket granted to him under the authority of this act and remaining in force." 6 & 7 Vict. c. 86, § 10.

"And be it enacted, that every licensed driver * * * shall at all times during his employment and when he shall be required to attend before any justice of the peace, wear his ticket conspicuously upon his breast, in such manner the whole of the writing thereon shall be distinctly legible; and every driver * * * who shall act as such, or who shall attend when required before any justice of the peace, without wearing such ticket in manner aforesaid, or who, when thereunto required, shall refuse to produce such ticket for inspection, or to permit any person to note the writing thereon, shall for every such offense forfeit the sum of forty shillings." Id. § 17.

"And be it enacted, that upon the expiration of any license granted under this act the person to whom such license shall have been granted shall deliver such license and the ticket relating thereto to the said registrar; and every such person who, after the expiration of such license, shall willfully neglect for three days to deliver the same to the said registrar, and also every person who shall use or wear or detain any ticket, without having a license in force relating to such ticket, or who shall for the purpose of deception use or wear or have any ticket resembling or intended to resemble any ticket granted under the authority of this act, shall for every such offense forfeit the sum of five pounds." Id. § 18.

"And be it enacted, that every driver of a hackney carriage within the limits of this act shall, on each occasion when such carriage shall be hired, deliver to the hirer thereof, a card, on which shall be printed in legible letters and figures, the words, "Hackney Carriage" and the number of the stamp office plate fixed on such hackney carriage, or such other words or figures as the said commissioners of police may direct." 16 & 17 Vict. c. 33, § 8.

"And be it enacted, that if any person shall keep, use, employ, or let to hire any hackney carriage at any place within the distance of five miles from the General Post Office in the city of London, without having a license in force so to do, or without having the proper numbered plates properly placed and fixed upon such hackney carriage in the manner required by this act; * * * every such person so offending in any of the several cases aforesaid shall forfeit ten pounds." St. 1 & 2 Wm. IV, c. 22, § 22.

"And be it enacted, that in any complaint or other proceeding for the recovery of any penalty incurred under this act in respect of or with relation to any hackney carriage, if evidence shall be given that the carriage in respect of which or in any manner relating to which any such proceeding shall be commenced or prosecuted was seen in or upon any public street or road having thereon any numbered plate by this act directed to be fixed upon a hackney carriage, or having thereon any plate resembling or intended to resemble any such plate as aforesaid, such carriage shall be deemed and taken to be a hackney carriage, and such evidence as aforesaid shall be received, as sufficient proof that such carriage was kept, used and employed and let to hire as a hackney carriage within the meaning of this act; and that in all such proceedings as aforesaid the name as described in the license granted

with or relating to the number of the stamp office plate, if any, fixed or placed upon any such carriage, whether such license shall be in force or not, shall for the purpose of this act be deemed to be the proprietor of such carriage unless the contrary be proved." Id. § 24.

"And be it enacted, that * * * in case where any hackney carriage plate shall be in the possession of or be used by any person who shall not have a license in force relating to the same, it shall be lawful for any officer of stamp duties * * * to seize and take away any such plate whereso-ever the same may be found * * * and if in any such case where any such plate shall be found in the possession of any person who shall not have a license in force relating to the same, it shall appear to the satisfaction of the said commissioners that the said plate is or was so possessed by such person for the purpose of being used with the consent of the person to whom the license relating to the same shall have been granted, or that such licensed person had parted with the same for the purpose of being used by any other person and also in any case where any plate shall have been recalled as afore-said and not delivered up, if they shall think proper, to revoke the license to which such plate shall relate." 6 & 7 Vict. c. 86, § 26.

"And be it enacted, that every driver * * * authorized by any pro-prietor to act as driver of any hackney carriage * * * who shall suffer any other person to act as driver of such hackney carriage * * * with-out the consent of the proprietor thereof, and also every person whether duly licensed or not, who shall act as driver * * * without the consent of the proprietor thereof, shall forfeit the sum of forty shillings." 6 & 7 Vict. c. 86, § 27.

"And be it enacted, that no hackney carriage shall ply for hire within the limits of this act unless under the charge of a driver having a license from the said Secretary of State. * * *"

## The opinions in King v. L. I. Cab Co. Lim., supra, are as follows:

"Lord Esher, M. R. Having listened to the cases which have been cited, and carefully examined the provisions of the statute, I have come to the conclusion that the defendants are liable. In my opinion, the agreement proved to have been made between them and the driver did not constitute the latter their servant. The payment of a certain sum to the proprietor every day, and the retention of the remainder of the earnings, may be con-sidered as a mode of payment of wages; but it seems to me that the agree-ment did not give to the proprietor such control as he would have over a servant. Further, I do not consider that the cases decided as to the hiring of a cab will conclude this case, which arises between a stranger who has not hired the cab, and the proprietor. Lord Campbell's judgment in Powles v. Hider may be upheld on the ground that the proprietor had held himself out as owner to the person who hires a cab. The question here is a different one, and arises on the construction of the act. Without going in detail through the sections of the act, it seems to me to be a necessary implication arising from them that the act was made in favor of the public, irrespective of the agreement that might subsist between the proprietor and the driver. I have come to the conclusion that by virtue of the act the public are entitled, whether, as between the proprietor and the driver, the relationship of master and servant exists or not, to say that, so far as the public are concerned, that relationship must be deemed to exist. That was the view taken by Cockburn, C. J., and Mellor, J. in Venables v. Smith, and also by Willes, J., in Fowler v. Lock. I think that is the right view of the statute, and that the decision in this case was right. The appeal should therefore be dis-missed.

"Lindley, L. J. I am of the same opinion and for the same reasons. I will only add that the regulations as to what has to be registered and accessible to the public seem to be based on the supposition that where a proprietor allows persons to drive his cabs in the public streets such persons so far as the public are concerned are to be deemed servants of the proprietor. All the cases except King v. Spurr are consistent with this view and that case may be distinguishable though the distinction may not be a very broad one,

for there the cab only was hired by the driver, and the horse was his property.

"Lopes, L. J. If it were not for the act of Parliament, I should have said that the relationship between the cab proprietor and the driver was that of bailor and bailee. The question, however, turns on the true construction of 6 & 7 Vict. c. 86, and that, in my opinion, puts the driver, so far as regards the public, in the position of servant, and the proprietor in the position of master, with the liabilities that attach to that position. It is true that the driver is paid by the amount of his receipts over a fixed sum which he has to hand over daily, but that is only a mode of paying wages, and whether they are paid in that manner or in some other way, weekly or otherwise, seems to me to make no difference in the effect of the act.

"Appeal dismissed."

It is urged, however, that at common law, with this contract between the owner and driver in existence, the relation of master and servant does not exist, and that it is not within the power of the Legislature of the state of New York to confer on the municipal authorities of the city of New York power to enact an ordinance or law for the government of its hack owners, running hacks for the transportation of passengers in its streets and avenues for hire, changing the common-law rule of liability.

The Greater New York Charter (being chapter 378, Laws 1897) provides, section 4, c. 1, p. 3:

"For all purposes the local administration and government of the people and property within the territory hereby comprised within the city of New York shall be in and be exercised by the corporation aforesaid; and the municipal assembly, as in this act constituted, subject to the conditions and provisions of this act, shall exercise all the powers vested in the corporation of the city of New York by this act or otherwise, save as in this act is otherwise specially provided."

Section 17, c. 2, p. 7, provides:

"The legislative power of the city of New York shall be vested in two houses to be known, respectively, as the council and the board of aldermen to be together styled 'The Municipal Assembly of the City of New York.'"

By section 41 the ordinances then in force were continued, so far as the same are not inconsistent with the act.

By section 49 it is provided:

"Subject to the provisions of this act, the municipal assembly shall have power within said city to make, establish, publish and modify, amend or repeal ordinances, rules, regulations and by-laws not inconsistent with this act, or with the Constitution or the laws of the United States, or of this state, for the following purposes."

Then follows in subdivision 3 a provision in regard to the use of streets, highways, roads, etc., by foot passengers, animals, vehicles, etc., and in subdivision 20 a full provision in relation to public cartmen, hackmen, cabmen, etc.

By section 50 it is provided that:

"The foregoing or other enumeration of powers in this act shall not be held to limit the legislative power of the municipal assembly which, in addition thereto, may exercise all of the powers vested in the city of New York by this act, or otherwise, by proper ordinances, rules, regulations and by-laws not inconsistent with the provisions of this act, or with the Constitution or laws of the United States or of this state; and, subject to such limitations, may from time to time ordain and pass all such ordinances, rules, regulations

and by-laws as to the said municipal assembly may seem meet for the good rule and government of the city, and to carry out the purposes and provisions of this act or of other laws relating to the said city, and may provide for the enforcement of the same by such fines, penalties, forfeitures and imprisonment as may by ordinance or by-law be prescribed."

It is urged by the defendant that if the ordinances of the city of New York quoted and referred to change the common-law rule of liability so as to make the bailor responsible for the acts of the bailee, or so as to modify the facts necessary to constitute the relation of master and servant, they are inconsistent with the laws of the state of New York, and null and void. Assuming it to be true that no ordinance can be established inconsistent with the statute of the state duly enacted and applicable to the city of New York, it is also true that the provisions of the charter in question have no reference to the common-law rules prevailing in the state. Swift v. Tyson, 16 Pet. 1, 18, 19, 10 L. Ed. 865; B. & O. R. Rd. v. Baugh, 149 U. S. 371, 13 Sup. Ct. 914, 37 L. Ed. 772; 18 Am. & Eng. Encyclo. of Law, 569, and notes. Such words used in such a connection refer to the statutes of the state, the expressed will of the Legislature made known by express enactments, and not to the common law. The legislative will expressed in a statute for the government of the city of New York cannot be thwarted by a municipal ordinance inconsistent therewith. But no reason is apparent why, under this power conferred upon the legislative assembly of the city of New York, it should not be at liberty to change the common-law rules of liability when exercising its power to regulate traffic, etc., in the public streets, and control cabmen and hackmen transporting passengers therein for hire. These are regulations, etc., made in the legitimate exercise of the police power. The legislative branch of the government may delegate its powers to municipal corporations created by it, which corporations are merely instrumentalities of the state for the better administration of the government in matters of local concern. It has been held by the Supreme Court of the United States, following this rule, that, where municipal corporations are created, the legislative branch of the government may delegate to such corporation the power of taxation, which power belongs exclusively to the legislative branch of the government. U. S. v. New Orleans, 98 U. S. 381, 25 L. Ed. 225. See, also, 20 Am. & Eng. Encyc. Law, 1139.

So long as the statutes of the state of New York do not specify what facts must exist in order to constitute the relation of master and servant, it must be competent for the legislative assembly of the city of New York to provide what facts are essential to constitute that relation between the owner of hackney cabs and the drivers thereof, when such owner and driver take out licenses under such ordinances for the purpose of using and driving cabs in such city for the transportation of passengers therein. This is clearly so, so far as fixing and imposing liability for the acts of the driver are concerned. This matter is not regulated by any statute of the state, and is left to the city, as a matter of local self-government, where conditions are such that a rule different from that prevailing in the remainder of the state may well be necessary. The common-law rule

prevails because the legislature has not seen fit to provide a different one by statute.

But quite independent of this question, this court is of the opinion that in this case the defendant, as has been stated already, by affirmative acts and conduct held this driver out to the public as his agent and servant in driving and using this cab for the purposes mentioned, and that, so far as the plaintiff is concerned, he is estopped from denying that he is responsible for the acts of such driver, or that he was his servant. The defendant selected this driver, placed his licensed cab in his hands, drawn by a horse owned by the defendant, and delivered to and placed upon such driver the badge issued by the city, and which was to be worn by the driver of that cab, and by a driver who was to represent the defendant, and for whom the owner of the cab was to be responsible. The defendant recognized the validity of these ordinances, and acted under them, and availed himself of their privileges and benefits, and held himself out to the public as the owner and operator of a cab doing business under and pursuant to those ordinances, and cannot escape the liability imposed thereby, so far as passengers and the public are concerned, especially as to a person injured by his horse and cab while upon the streets under a license granted pursuant to such ordinances, and managed by a driver upon whom he had placed a badge of authority, which said to such injured person, "This driver represents the owner of the cab, and for the acts of the driver such owner is responsible." See Bigelow on Estoppel, p. 582.

All persons using the streets are presumed to have known these ordinances, and to have acted in pursuance thereof.

The motion to set aside the verdict and enter a nonsuit is denied.